Good morning, everyone. My name is Philip White. I'm here on behalf of the Harper Family Trust. Wait until everybody sets up, and then when you're ready to talk, please stand in front of the microphone so it picks up. So let everybody get set up, and then we can talk. When you're ready. Good morning. My name is Philip Whitener. A pleasure to appear in front of Your Honors. I'm here on behalf of Mr. Harper. I understand I have 20 minutes. I'm going to try and reserve about 10 for rebuttal. Okay. We'll try to help you keep track. I appreciate that. May it please the Court, all parties assembled, there are three main issues in this appeal. The one is the use of Rule 82, which is a somewhat unusual rule under Alaska law, as the so-called English rule, as the prevailing party in cases on attorney's fees, to basically punish a successful litigant that the Court didn't like. There's two issues on that in terms of who was really the prevailing party and why enhanced attorney's fees of seven times the normal attorney's fees to be awarded should be sustained, where there's actually punishment without due process, basically for an unpopular litigant. Is there a third element there, and that's the standard of review that we look at relative to the action taken by the judge, and isn't this an abuse of discretion review? It is, Your Honor, but it's an abuse of discretion not merely as to the facts, but the purpose for which the award was used, and that's the real error in this case. Punish the purpose of why he made the award? Yes, to punish the litigant. Actually, Your Honor, there's an abuse of discretion as to the facts, but we went on the purpose, so you may not have to reach that matter. There's also an issue as to the defamation claim in terms of a statute for privilege, which has serious public policy implications not only for the state authorities and the federal authorities, but I'm not going to focus too much on my argument on that because the real issue in this case is the attorney's fees. In terms of the issue of who was the prevailing party, it's important to see, first of all, what the appellees tried to obtain from the court and lost on. Even in their final argument after trial, they wanted $1.7 million from Mr. Harper. They lost. Basically, the judge adopted Mr. Harper's position, which was the right position, that basically there was a one-third split in an informal state distribution, and they got about $60,000. They lost $1.7 million. In their final argument, their written final argument, that's in the excerpts of the record, and I'll give you a slide on that in a moment. In their final argument, they wanted $220,000 from the defamation claim. They got $2,500. Alaska law is absolutely crystal clear. Merely because you get a judgment, it doesn't mean you're the prevailing party if you get a little bit of what you're seeking. They took the position that Mr. Harper had to pay $1.7 million because he had put some of his own funds into the so-called Schwab One account, and the court found that was wrong. They were after the wrong account. They lost on that. Well, that wasn't their position. Their position was they were entitled to that amount of money because he put the trust funds into that account. You argued that they didn't get the money because they were his own funds. That is to say, they didn't make the argument you described. You won on that argument, but you did not categorically describe their argument. Well, their basic position was that – let me back up for a moment and outline the facts. Sylvia had the money because they had distributed funds basically because they were concerned about Medicare benefits. The court properly found there was no trust for Sylvia, no formal trust, nothing. Sylvia then distributed approximately $141,000 to Glenn into his personal account. In order – since the check wouldn't clear for a week, he took $120,000 of his own money and put it into a joint account with A.J. and Glenn. But the plaintiffs – I'll call them the plaintiffs – took the position that that money that went into the Schwab account was trust money. And they took the position, even in their final argument – and I can give you a precise reference in terms of the excerpts and the actual language they used – they took the position that there was a formal trust, he had formal trust duties, and that he was charged with paying the top amount. No, I understand that. They're trying to trace it into the account that had a lot more increase in value, and they lost on that. Right. But they won on – and I gather this is what the district court thought important in terms of a prevailing party for purposes of Alaska Rule 82 – they did win on the point that they were entitled to an accounting. And in the accounting, once you go through it, the position your client took as to where the money had gone prevailed. Am I accurately describing the course of the litigation? You're accurate that the position my client took as to where the money prevailed. It's murky as to what really constitutes an accounting where there is no formal trust. And the court specifically found no formal trust, no formal trust duties in terms of commingling, no formal trust duties in terms of fiduciary duties. All they had to do was do a distribution. Now, it was even stipulated at trial they had all the bank records before trial. It was all produced in discovery. Our expert, Mr. Fucco, was correct in where the money went, and that was basically the model for the judge's distribution in the end. So they really did have an accounting. It's striking if you compare the decision of the court on the merits and the decision of the court on the attorney's fees as to what was really said. In the so-called first decision, which is the decision on the merits, which starts at excerpts 359, the court held, at trial, Glenn did provide the court with an accounting prepared by a CPA who he engaged in as an expert. That's Mr. Fucco. The court has found that the assumption which Glenn's accountant was instructed to make was more probable than not the correct view of the tracing issue. With some adjustments, the court finds that Fucco accounting accurately reflects the trust assets and the expenditures made by Glenn for the benefit of mom and or to one another of the siblings. That's at excerpt 373. So he basically provided an accounting. At trial. That was before trial. That expert report was provided before trial, Your Honor. And there was a deposition taken on that. And we provided that to them. And actually, the judge had initially suggested that there be an independent expert to do such an accounting, and the parties couldn't agree because they still wanted their 1.7 million. But that expert report, and there was a stipulation, and I referred to it in my brief, there was a stipulation they had all the bank records before trial. Then the court found, and it's on the merits, found specifically, and this is at excerpt 381, the resulting trust is equitable, the sole duty is to convey the property to the beneficiaries, and that there were no formal duties. The court specifically found, as the resulting trustee of mom's money, that's after Sylvia gave it to Glenn, Glenn did not owe A.J. and James any fiduciary duties relating to his management of control of mom's money. What happened then was, is basically. And he further said that the sole duty of the trustee and the resulting trust are constructed is to convey the property to the beneficiary. Right. And that hadn't been done, I don't think. Well, there were attempts made to do that, but they wouldn't accept anything other than $1.7 million. And there were actually some initial distributions that had been done in terms of the sales of the property and such. I mean, until they lost finally on the merits, they still wanted $1.7 million on the wrong theory, and they wanted $220,000 on defamation. There was actually a $60,000 distribution, I think, from Glenn. But the real issue is how can you punish someone because you don't like them as a litigant because they happen to be an attorney and accountant? Now, I'm not sure that's your characterization of what happened. If we assume, and I understand you're contesting this proposition, if we assume that the district court was correct as to who was prevailing party, as I read the district court order on fees, what then kicks up the amount of fees is the district court's explicit finding that the litigation by Glenn was carried on vexatiously and in bad faith. Now, I think we've got to leave that factual finding alone unless we find it clearly erroneous or in some fashion an abuse of discretion. All right. Well, first of all, there's still two issues on that. That finding is erroneous, and it is clearly erroneous about being vexatious. But even if you went that far, you still don't kick it up seven times. That's the issue. But let's just address that for a moment. What was Glenn to do? They wanted $1.7 million. He had to defend himself. They claimed that he had defamed A.J., and they wanted $250,000 before trial. Then they moved to $220,000 after trial because he told the police facts that were true. He had to defend himself. That's not vexatious litigation. You say he told the police facts that were true. You now have a judgment against you on that point. The amount of damages is fairly low, but you have a clear finding that there was defamation. There was a finding, Your Honor, there was defamation, but not that the facts were not true. It was the hypothesis he referred to. But all the facts he told the police, and this is all in my brief and his admissions, all the facts he told the police were true. And, Your Honor, I mean, I just want to touch on this for a moment, but I ask you to consider this. If the courts are going to start, first of all, finding defamation and then punishing a successful litigant in a related action because of defamation, because of giving information to the police as to the suspects, it's going to be serious. You're adding things to the district court's order, which is fairly lengthy and quite explicit, that are not there. That is to say, he's not saying, I'm punishing this litigant because I don't like him. He's saying, I'm kicking up the attorney's fees because I conclude that this litigation was carried on vexatiously and in bad faith. Well, but, Your Honor, with all due respect, Your Honor, what he said was this. He only awarded $2,500 for defamation. And he first says you can't have a double recovery, but then he says because of the defamation, I find that the other litigation was vexatious and that it doesn't follow. And the facts are reported to the police related to justifiable suspicions that should be reported. And if people get punished for this, then anyone that reports a potential terrorist or someone like the Unabomber, who appear to be ordinary people but are actually doing bad things, are going to be punished. And there's actually a serious privilege issue on this defamation claim. But what the court really said was, on the one hand, and it's right on his opinion, he says they're asking for double recovery. They want basically tens of thousands of dollars now because of the defamation actions. I won't do that. And then he turns around and says it's vexatious litigation. But the bottom line is, what was Glenn to do? He wasn't a formal trustee. They said he was. He didn't have fiduciary duties. They said he did. He didn't have any duties not to commingle. They said he did. They wanted $1.7 million. They were wrong. They wanted monies from the wrong account. He had to defend. And in pretrial proceedings, there's a stipulation, and I refer to it in my brief. There was a stipulation. They had all the records from the proper account. All the bank records were turned over. The HUCO report was turned over. They were told what the judge finally found were the facts. What better accounting can you give? And I need to refer to this for a moment. Actually, the court found there was an equitable trust. There hasn't been any appeal on that, but the real proper findings should have been an equitable charge.  Well, I understand what you're saying. I'm having a hard time because I'm looking at the order of the court relative to the award of the attorney's fees, and your argument to us that there was a punishment. On Excerpt to Record 11, it's page 8 of the judge's order. He goes through chapter and verse before he talks about why this is happening. He talks about everybody losing after everybody spending $474,000, a kind of a litigation which leaves clients dissatisfied, leaves a lot of public grumbling. The problem was not the lawyers. It was the clients having dysfunctional sibling relationship. He goes through chapter and verse, and then he talks about Glenn needlessly, negligently, inescapably commingling his money. Now, if those facts are clearly erroneous, then maybe we've got a case. But apparently he summed up what happened in this litigation about the siblings not being able to get along and what happened. And what's wrong? Is he clearly erroneous in that basis of fact-finding then? Well, yes, first, yes, he is, and let me tell you why. Is it just more sibling argument we're going to go through, or is there some facts going on? No, here, first of all, by the judge saying that he was negligent in commingling, he flies in the face of a law which says there is no duty not to commingle on an equitable trust. That's the law. On the one hand, he finds properly that there was no formal trust and no duty, no fiduciary duty. And then he says that since he somehow violated a fiduciary duty that didn't exist, that that's a reason for a commingle. It doesn't matter what kind of trust you have. If you commingle, you commingle. I mean, a trust is a trust. So whether it's a formal trust, an express trust, an implied trust, he said he commingled, and he did commingle, didn't he? Well, Your Honor, so did Sylvia. And, Your Honor, with all due respect, Your Honor, that is not the law. You can commingle on an equitable trust. That's what the law says. There's no formal duty not to commingle. That's right. That's the clear law. That's what the judge found. I get your point. The point is that he was clearly erroneous in his findings. Well, he was erroneous for punishing him for any so-called commingling. Well, no, the punishment is what you're asking us to deem from these findings. And so if the findings are clearly erroneous, maybe he was punishing. Right. Is that right? You know, well, you seem to have a malfunction of the clock. You're down to about four and a half minutes. You said you'd like to save time. I will. And I didn't want to interrupt you, but do you want to say what you do have? I will. All right. Okay. Okay, please, the court. My name is Tom Finley. I represent A.J. Harper, and I intend to use, I hope, no more than half the time and reserve the remainder of the 20 minutes for Mr. Freeman, who represents Jim Harper. Ten minutes per person. Okay. Thank you. A number of issues were presented to Judge Holland in this case. Mrs. Harper had transferred her real property and her money to Sylvia, and Sylvia had then transferred the real property to A.J. Harper and Jim Harper and the money to Glenn. The first thing Judge Holland had to do was figure out what the relationship was between the siblings and the property that had been given to them. A.J. Harper and Jim Harper argued that a trust relationship had been created, and because a trust relationship had been created, there was a duty of Glenn Harper to account for the money that was given to him. They also alleged that the money had been commingled, and the facts supported that, and they argued that there was a duty to account for the funds. The judge ruled in A.J. Harper and Glenn Harper's favor on these issues. He also ruled that Glenn's claim that the actions of A.J. and Jim in seeking an accounting and in freezing a Merrill Lynch account interfered with his prospective economic advantage was not proven in court, and ruled against Glenn on that, and he ruled in favor of A.J. Harper on the defamation issue. These points were part of the basis for the judge ruling in A.J. Harper and Jim's favor on the prevailing party matter, but the judge also said that fundamental to his decision throughout the case on the main issue, which was accounting, was getting an accounting. In 1998, the request was made by A.J., Jim, and Sylvia, and Glenn ignored it. In 1999, the request was there. It was ignored. When discovery proceeded, it was learned that the $141,611 had been commingled, and, of course, once the funds are commingled, an accounting is necessary to determine, ultimately, which money belonged to the trust and which money didn't, which money remained the personal property of Glenn Harper. Ultimately, the judge correctly found that A.J. Harper and Jim Harper had attempted to account for the property given to them, but Glenn never accounted, even at the end of the day, for the money that was given to him. The accounting, the judge found, was incomplete, and he's right. There's an allegation during this argument that Glenn Harper provided an accounting, attempted to cooperate in getting an accounting. I would refer the court to the excerpt of record at 525. It's a letter dated December 6, 2001. I wrote it to Mr. Widener, and the third paragraph says, again, as I stated in our telephone conversation, it would facilitate the entire accounting process if David Freeman and I could consult with your accountant to make sure the scope of work performed meets the legal requirements for accounting for the funds. It was an attempt to get one accountant to go through all of the records, to get all of this in front of the judge, so that he would not have to ferret out from the pile of records he was giving which money went where. This letter was not only ignored, it was never shown to their accountant. The accountant at his deposition said he never heard of this request, and, in fact, the accountant at his deposition admitted that he was only given a partial group of the records. He never took the starting point of the check that went to Sylvia, went into the First National Bank account of Glenn Harper, and then went from there, we alleged, into the Charles Shock account. They alleged it went into the mutual qualified account. The judge was correct. He did not abuse his discretion when he said that underlying the entire case was the issue of the accounting. It was the factual issue that began the case, was a request for an accounting that started it and brought the parties into the court. It was fundamental once the funds were commingled, and it was still before the court at the time of trial. Let me ask you a question, just so I make sure I'm on the right footing. Counsel indicated in his argument that the accountant did do an accounting, that you had that before that accounting was presented to the court for adjudication. Can you give me sort of a sequence in how that worked out, and did you have the accounting? Was there a dispute about the accounting? Did it have to go to the judge to sort it out? What was going on there? As Judge Holland pointed out, what occurred was the records just before trial were given to Mr. Huko by Glenn Harper. But only some of the records were given. Mr. Huko was told that his scope of work assumed away the issue of whether the funds went into a mutual qualified account or the Charles Schwab account. If you look at Mr. Huko's deposition under cross-examination, he says he never got the original Charles Schwab records, or the records showing the very first deposit of the money into the commingled fund. So being the accounting is a central piece relative to attorney's fees, once you got this first accounting and you found that there was some problems with the accountant's information, then someone had to sort it out, and then you were forced to go to court to sort that out. Exactly. Again, if you go back and you look at the letter that was written in December of 2001, it was an attempt to avoid having the judge have to sort this out. It was, from our perspective, the logical request to get one person with the expertise to un-commingle, if you will, the commingled accounting. In a formal manner, speaking of an accounting, because we're talking about a trust, no matter what type of trust you're talking about, until the court was offered all the data, nobody came up with a determinative, finished accounting, if you will, which, in fact, did rule against your theory of the case. Isn't that right? No. I mean, you didn't get the recovery you thought you would get after the accounting was through. That's not the relevance here. The thing is, you didn't even find that out until the court was offered all this information and made the findings. That's correct. In the tracing process, as you got into the accounting and then you traced where the funds went, we had offered to the court that we felt $141,611 went into a checking account. When the check cleared, $141,000 minus the $611 went into a Charles Schwab account. The logic, which the judge said was plausible to us, was that's where the funds went. The judge ruled that $141,611 went in. $120,000 went into a mutual qualified account. I think because A.J. Harper's name was also on that account, he felt that that was enough evidence for him to find that part of the $141,000 at least probably went into that account. What happened to the $21,000, as he points out, some of it was spent improperly by Glenn Harper. That was the money that was reserved to take care of the mother, who was still alive at the time, as I remember, or allegedly. Is that right? Didn't he retain some funds to help care for the mother? Yes, that was his testimony. Okay. The judge found that he spent it on himself, and that's a finding of the court. Okay. You're at ten minutes. You're just over. Do you want to share at this point? Go ahead. I get to go ahead? Okay. It's up to you. I just need five. He's on a roll. You need five? He's on a roll. I just heard he needs five. Okay. I think that the court understands the focus that we believe. The judge was correct when he ruled that the issues all centered on the issue of Nicali. That was fundamental throughout the whole thing, and it's only at the very end when you finally trace that Glenn Harper prevailed. It seems to me that where this all starts is that when the sister transferred the funds, or was going to transfer the funds, because there was a check transaction or a financial transaction by Glenn before he actually received the funds, it set up this sort of a discord that nobody could reconcile. Because if you're going to trace on an accounting basis dollar for dollar, then your theory was you had to wait until the sister's money came and you traced that dollar. But, in fact, he was tracing the other dollar. So it's sort of a confusing thing. Was that part of the accounting problem that had to be sorted out? That was a major part of the accounting problem that had to be sorted out, because instead of taking the check and putting it into a separate account, he put it into his own personal checking account. So then you're trying to trace specific dollar for dollar where those dollars went. Yes. The first thing that happened when Mrs. Harper suffered an insulin reaction and was sick, AJ Harper said, Glenn, we're going to need some of that money. We need to be ready to help mom because she's sick. And the reaction he got made him talk to Jim and Sylvia and say, we need Glenn to account for the money, because Glenn wasn't very forthcoming about, OK, I'll get money available. In 1998, every request for an accounting of the money met with, no, I don't have to, or I'm not going to. And then it quickly, and this is where I think the judge was correct in enhancing the fees. By the way, the enhancement was only to 30 percent. The evidence allowed, I think, the judge to enhance it to 70 or 80 percent, which has been done in Alaska. Quickly, when the brothers were trying to account for the real property by selling it and depositing the money into the court funds, Glenn Harper filed the Liz pendants on the property, interfered with their attempts to sell it. And even when they said, OK, how about if we sell it to you, Glenn Harper, would that satisfy you? He said no. And we had to go to court to get an order from the court to remove the Liz pendants and to get the money, to allow the sale to go forward. All the time, with the understanding the money was going to go to the court anyway. And with regard to the defamation, the allegations, which the judge called bizarre, they're actually sadistic, malicious, and extraordinarily bad faith. Unbelievably, he accuses his brother of being a serial killer, makes anonymous calls to the Spokane Police Department from Anchorage, tells the Spokane police, my brother could be the serial killer that you're looking for, with the purpose of getting the Spokane police to go arrest him in his backyard and embarrass him. And how do you know that this is totally, totally false? Because the allegation is, in 1968, he killed a man in Wallace, Idaho. And here it is, 1998, October, what's occurred? He's been asked to account for the funds. And every escalation of the lawsuit, every time there's a deposition, the allegations go more and more and more serious. And if you read, it's Exhibit 29, the entire exhibit, the whole police record. It ends in the police telling him, knock it off. AJ has come in voluntarily, he's given us a DNA sample, he's cleared, don't call us anymore. Defective espouse says, don't call it. The trial, Glenn Harper says, what wasn't me calling, it was AJ Harper calling. Preposterous. Okay, we've got that pretty much in hand. We're now down to about five minutes. We're having terrible trouble with the clock, it seems to be malfunctioning on us. Could you reset it at five when we start this one? Thank you. Yeah, it just quits. I'm watching it. But in any event, we'll put five minutes on the clock here for the remainder of this 20-minute argument. Hey, please, the Court. My name is David Freeman. I represent Jim Harper. Jim's argument really is very simple. There are two issues on appeal which relate to him. He was a prevailing party on the main issue and all secondary issues that were tried, and he was entitled to enhanced fees under Rule 82b-3. Glenn's argument about what was the main issue in the case is addressed and determined by several sections of Judge Holland's findings of facts and conclusions and the order on the attorney's fees motions. The main issue is whether Glenn had a duty to provide an accounting to his siblings. Glenn's argument to the contrary was handled by Judge Holland as follows. He said that Glenn's argument that the Court relied upon his expert's accounting with respect to Mom's money also fails to tell the whole story. Glenn did not turn over to his accountant all the pertinent records. Rather, Glenn instructed his expert to assume his theory of the tracking aspect of the accounting dispute, which was that Mom's money went to the mutual qualified fund, not the Charles Schwab account. The fact that the Court found that Mom's money was intended to be reflected by the mutual fund account, as well as the fact that fine arguably avoided a much larger liability on the part of Glenn, does not alter the fact that the fundamental issue here was Glenn's failure to provide A.J. and Jim with an accounting at all, much less share the money entrusted to Glenn and, as to this issue, A.J. and Jim prevail, clearly wipes out Glenn's argument to the contrary. By this analysis, Judge Holland recognized that Glenn avoided a larger liability to Jim and A.J. because of the way the trial court traced the money. But that doesn't alter the finding that Glenn failed to provide an accounting, which is what the lawsuit really was all about. In fact, he failed to do so in a negligent and bizarre fashion, according to the judge. Jim also prevailed in his other cross-claims and successfully defended against Glenn's claims as well. The Court found that Glenn needlessly, negligently, and inexplicably commingled Mom's money with his own personal funds. The $15,000 gift to Jim by Mom through Sylvia was not used to reduce Jim's allocation of the funds held in the court registry. There was no impropriety in Jim's sale of the Lark property. Glenn's filing of a list of pendants on the Lark property was needless and caused Jim to incur fees. Accordingly, on all of the issues tried before, Jim was a prevailing party and entitled to rule the utilities. Judge Holland properly awarded Jim 30% enhanced fees. Under Kirk v. Mortensen, the case we cited in our brief, he would have gotten 80%. Judge Holland, as the Court indicated, painstakingly reviewed the rule A2B3 requirements for enhanced fees. He found some didn't apply. But he found enough of the requirements that did apply so as to warrant the enhancement. He couched his rulings on what he saw and heard in the courtroom. While the cold record that you have may not entirely convey what Judge Holland saw and heard regarding Glenn's behavior and testimony, but that certainly conveys his findings that Glenn's conduct, both prior to trial and during trial, was negligent, bizarre, evasive, disruptive, and most importantly, incredible. To match the A2B3 factors to Glenn's conduct, Judge Holland found that Glenn carried on the litigation vexatiously and in bad faith. That Glenn was the occasion of all parties having to spend more money fighting over assets. The number of hours expended on Jim's attorneys was reasonable. Glenn's litigation stance was such that it was not possible for Jim to minimize his fees. The fees recoverable under Rule A2B1 were wholly inadequate. The 30% fee allowed by Rule A2B3 was a better, more equitable and appropriate measure of fee shifting. And so all of those factors worked for enhancement. The determination of who is the prevailing party is within the broad discretion of the trial court. The award of attorneys fees to Jim can only be overturned by this court if you find that Judge Holland abused his discretion by issuing an award to Jim that was arbitrary, capricious, manifestly unreasonable, or stemmed from an improper motive. Judge Holland sat through four days of trial. He reviewed exhaustive closing argument briefs. He issued proposed findings and conclusions. He reviewed the party's comments to those proposed findings. He issued 30 pages of findings and conclusions and issued a 20-page order on attorney fees. We ask that you affirm everything that Judge Holland decided. Okay, thank you. Mr. Widener, you've saved about five minutes. Thank you. Your Honor, in response to your question, trial was in January 7th of 2003. The Huco report, the deposition was in July of 2002. They had all the information. Actually, Mr. Huco's deposition was simply submitted to the court at trial, as was his report. There were no facts brought forward at court as to any so-called accounting that weren't available to parties before trial. What is an accounting? What could Mr. Harper have done? They didn't agree on the account. Mr. Huco did have all the records. It's in his deposition at page, which is a part of the record, excerpt 498. He had all the records before his deposition. They simply didn't like the account. The court properly found that a trustee of a resulting trust, Your Honor, with all due respect to Your Honor, has no duties or responsibilities as to the management, control, or distribution of the property except perhaps to convey the trustee's direction. The sole duty of a trustee in a resulting trust is to convey the property to the beneficiary. It's not the same. You can convey. You don't have to provide a formal accounting. What could he have done? Mr. Huco explained to them, and the judge adopted that proper position that that was the account at issue and all the records were provided to them. To come in here and start talking about insulin or defamation is simply to try and ask this court to make the same mistake that Judge Holland did, which is to punish Mr. Harper on a defamation claim that there was $2,500 awarded for and $500 in attorney's fees, and then to try and sustain basically a $75,000 award of attorney's fees, which as to A.J. is seven times what is proper. If you look at the court's findings, actually, even on the attorney's fees, he found the case was not complex. He said the court is seriously considering concluding here that no one prevailed. But on the prevailing party argument, they don't dispute the fact that even as of April, after the trial in January, they were still asking for $1.7 million. I give you the excerpt site. They were asking for $220,000 on defamation. That's in excerpt 417. They were asking for $1.7 million even after the trial, and we won on that. So who's the prevailing party? The only excuse that the court found to basically punish Mr. Harper was that supposedly there was no accounting. But, Your Honor, what could he have done? The factual dispute was which account. He gave a full explanation through the records and through his expert report, which was adopted by the court, as to what happened in the proper account. So there's no such thing as a magical definitive accounting, Your Honor. It doesn't exist when there's a factual dispute as to which account was at issue, and they wouldn't accept the proper explanation on the account. So what basically happened here was is after he won and prevailed the trial, they wiped him out on the attorney's fees, and that simply is an unjust result. So I ask Your Honor to recognize that it's not simply the factual issues as to who is the prevailing party, but it's the purpose of the rule, and you can't use a Rule 82 rule to accomplish a purpose that's not under the rule. You don't punish unpopular litigants. The reference to the formal request for $1.7 million post-trial, that request for $220,000 was actually in October. They were still trying to get $220,000 on defamation, and the request for the $1.7 million was in April. But what this case comes down to is this, and I ask you to please focus on this. You can't say that merely because Mr. Harper was an attorney or accountant there's some extra duties. We must focus on the reality of this situation. This was a trust, an informal trust, imposed after the fact. This type of conduct occurs hundreds of times each year throughout this country, where people try and basically split up families and states. If unhappy siblings can claim a formal trust exists when it doesn't, and then subject someone such as Mr. Harper to duties that are formal trustees when they don't exist, it will needlessly complicate litigation instead of simplifying it. Thank you. Thank you very much. Thank you. Both sides. In the case of Merrill Lynch, Harper v. Harper Family Trust, 03-360-15 is now submitted to decision. The next case on the argument calendar is United States v. Cruz. We'll take a ten minute break. We'll be back in ten minutes. In four hours. All rise. This court stands in recess for ten minutes.
judges: Goodwin, Brunetti, W. Fletcher